**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF GEORGETOWN APOTHECARY DBA GEORGETOWN PHARMACY, 1002 SOUTH BROADWAY, SUITE 7, GEORGETOWN, KY 40324 | Case No.: 22-MJ-5379 **Filed Under Seal** |
| BOURBONTOWN PHARMACY, 1822 MAIN STREET, PARIS, KY 40361 | |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jaime Terry, being duly sworn, depose and say:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since June 2017. I am assigned to the Louisville, Kentucky Field Office, Lexington Resident Agency. Prior to employment with the FBI, I served as a sworn police officer with the Metro Nashville Police Department for ten years. During my service as a police officer, I was assigned to the Patrol Division, Fraud Unit, and Major Case Task Force. As a Special Agent, I have participated in investigations into violations of federal laws. I am being assisted in this investigation by the Department of Health and Human Services, Office of Inspector General (HHS-OIG), the DEA, and the Kentucky Office of the Attorney General Medicaid Fraud Control Unit (KYAG MFCU).

2.       I am empowered to investigate and have investigated federal crimes, including healthcare fraud offenses and drug diversion. As such, I am a federal law enforcement officer authorized to apply for and execute warrants. I have also received

extensive training in the detection and investigation of healthcare fraud. I have received training as a special agent at the FBI training academy in Quantico, Virginia, relating to general investigative techniques, including training in legal principles and statutes as they relate to criminal violations of federal criminal laws including but not limited to laws related to financial crimes such as drug diversion, healthcare fraud, wire fraud, and money laundering.

3.      I have training and experience working with computers, cellular telephones, the evidence commonly retrieved on these devices, and the methods utilized to obtain such evidence. I have also consulted with other law enforcement agents on the application, methods, and seizure of evidence.

4.      In my role with the FBI, I have participated in numerous investigations involving violations of drug laws and laws prohibiting healthcare fraud. I have attended training related to—and been instructed in many aspects of—fraud investigations and investigations into the illegal prescribing of controlled substances. I have initiated or participated in both physical and electronic surveillance and in the debriefing of numerous participants in healthcare fraud schemes regarding the methods of perpetrating healthcare fraud. I am also knowledgeable about efforts utilized to avoid detection of criminal activity and the means and manner utilized to conceal illegal profits. I have also executed search warrants and analyzed records documenting the purchase and illegal distribution of drugs.

## STATUTORY VIOLATIONS

5.      Based upon the information set forth below, I have reason to believe and do believe that certain evidence supporting violations of the following federal criminal statutes

2

is presently being maintained and/or stored at Georgetown Apothecary DBA Georgetown Pharmacy and Bourbtontown Pharmacy, from herein referred to as ["SUBJECT PREMISES"].

6.      18 U.S.C. § 1343 prohibits the transmission in interstate or foreign commerce of any writing, signs, signals, pictures, or sounds by means of wire, radio, or television communication for the purpose of executing any scheme or artifice by one who has devised or intends to devise such a scheme or artifice. A violation of 18 U.S.C. § 1343 carries a maximum term of imprisonment of not more than twenty years.

7.      18 U.S.C. § 1347 prohibits, in connection with the delivery of or payment for health care benefits, items, or services, a person from knowingly and willfully executing or attempting to execute a scheme to defraud any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b), or obtaining by false or fraudulent pretenses, statements, or promises, any money or property under the care, custody, or control of any "health care benefit program" as that term is defined in 18 U.S.C. § 24(b). A violation of 18 U.S.C. § 1347 and carries a maximum term of imprisonment of ten years.

8.      18 U.S.C. § 1349 prohibits any person who attempts or conspires to commit any violation of 18 U.S.C. §§ 1343 and/or 1347 and subjects any person who attempts or conspires to commit that offense to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

9.      18 U.S.C. § 1035 prohibits a person from knowingly and willfully (1) falsify, conceal, or cover up by any trick, scheme, or device of a material fact or (2) makes any materially false, fictious, or fraudulent statements or representations or makes or makes or

uses materially false writing or document knowing the same to contain any materially false, fictious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services.  A violation of 18 U.S.C. § 1035 and carries a maximum term of imprisonment of five years.

## REQUESTED WARRANT

10.     Because this affidavit is made for the limited purpose of supporting the accompanying application for a search warrant, I have not included each and every fact I know about the investigation. I have set forth only those facts that I believe are necessary to establish probable cause to support the requested warrant.

11.     The purpose of the requested warrant is to search the SUBJECT PREMISES for evidence and proceeds of criminal violations relating to the dispensing of high-cost prescription vitamins and prescription scar pads in violation of healthcare laws in the Eastern District of Kentucky.

12.     This affidavit is submitted in support of application seeking a search warrant to search the SUBJECT PREMISES known as Georgetown Apothecary DBA Georgetown Pharmacy, 1002 South Broadway, Suite #7 Georgetown, KY 40324, and Bourbontown Pharmacy, 1822 Main Street, Paris, KY 40361, which are both described in greater detail in Attachment A.

13.     Your affiant alleges that there is probable cause to believe that a search of the SUBJECT PREMISES, referred to in Attachment A, will uncover items which constitute evidence, fruits, and instrumentalities of the commission of Healthcare Fraud, Conspiracy to Commit Healthcare Fraud, and Wire Fraud.

4

## <u>HEALTH CARE BENEFIT PROGRAMS</u>

14. The SUBJECT PREMISES have provided prescription drug services to recipients of Medicare, Kentucky Medicaid, and other healthcare benefit programs, as that term is defined in Section 24(b) of Title 18, United States Code.

15. Section 24(b) of Title 18, United States Code, defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." Both Medicare and Medicaid are federal programs administered by the Center for Medicare and Medicaid Services (CMS), which offer prescription drug benefits to certain covered individuals. Specifically, Medicaid is a joint federal and state program, which is administered by the Kentucky Cabinet for Health and Family Services, Department of Medicaid Services.

16. Medicare is a program established and funded by the United States to provide health insurance to elderly, severely disabled, or persons with chronic medical conditions. Medicare is administered by CMS, an agency of the United States Department of Health and Family Services. Medicare is funded through individual payroll taxes, other taxes, and user fees.

17. Section 101 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108-173) amended Title XVIII of the Social Security Act (the Act) by establishing the Voluntary Prescription Drug Benefit Program

(Part D). 42. U.S.C. 310 et seq. Effective as of January 6, 2006, Part D established an optional prescription drug benefit for individuals who are entitled to Medicare benefits under Part A or enrolled in Medicare benefits under Part B. Beneficiaries who qualify for both Medicare and Medicaid (i.e., are full-benefit dual eligible) automatically receive the Medicare benefit unless Medicare has identified the individual as having other creditable coverage through an employer-based prescription drug plan. The regulations governing the Part D program are set forth in 42. C.F.R. Part 423 (Voluntary Medicare Prescription Drug Benefit). Part D plan sponsors are nongovernmental entities under contract with CMS to offer prescription drug benefits.

18. The Kentucky Medicaid Program is administered pursuant to Title XIX of the Social Security Act. Medicaid provides medical assistance to indigent individuals who are aged, blind, disabled or to members of families with dependent children. The program is funded by both the federal and state governments. Kentucky Medicaid ["Medicaid"] is administered by the Kentucky Cabinet for Health and Family Services, Department of Medicaid Services.

19. Based on my training and experience, I know that prescription drugs must be authorized by a physician and dispensed to the patient in order for a pharmacy to receive reimbursement for health care benefits programs like Medicare and Medicaid. Health care benefit programs assign unique identification numbers for its beneficiaries.

20. Intentionally billing public and private insurers for services not rendered, not ordered by an authorized physician, or not medically necessary is a violation of the Health Care Fraud Statute, 18 U.S.C. § 1347, as well as potentially other federal statutes.

## STATEMENT OF PROBABLE CAUSE

21.  The Unites States is investigating Georgetown Apothecary DBA Georgetown Pharmacy, 1002 South Broadway, Suite #7, Georgetown, KY 40324 and Bourbontown Pharmacy, 1822 Main Street, Paris, KY 40361 for a variety of suspected offenses, including Health Care Fraud, in violation of 18 U.S.C. § 1347, Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349, Wire Fraud, in violation of 18 U.S.C. § 1343, and False Statements Relating to Heath Care Matters, in violation of 18 U.S.C. § 1035.

22.  According to Kentucky State of Secretary of State (SOS) filings, Justin Tyler Bell ["BELL"] filed Articles of Organization Professional Limited Liability Company (PLLC) for Georgetown Apothecary on May 9, 2013, with Brittany Cox. On March 3, 2014, the Kentucky SOS Annual Report filing listed BELL as the owner of Georgetown Apothecary. On March 4, 2014, BELL filed a Certificate of Assumed Name with Kentucky SOS stating Georgetown Apothecary assumed name was Georgetown Pharmacy. On January 28, 2022, the Kentucky SOS Annual Report filing for Georgetown Apothecary DBA Georgetown Pharmacy was filed by BELL, listing BELL as the President and Registered Agent.

23.  According to Kentucky SOS filings BELL filed Articles of Organization Limited Liability Company (LLC) for Bourbontown Pharmacy, LLC, on April 4, 2019. The last Kentucky SOS Annual Report filing for Bourbontown Pharmacy, dated January 4, 2021, listed BELL as the owner of Bourbontown Pharmacy. According to Kentucky Board of Pharmacy (BOP), BELL sold Bourbontown Pharmacy to Drew Brewer

["BREWER"] in May 2021.  BREWER had worked as a pharmacist at Bourbontown Pharmacy.  According to Bourbon County, KY Property Valuation Administrator (PVA), BELL was the owner of the building in which Bourbontown Pharmacy is located.  In September 2022, investigators observed Georgetown Pharmacy and Bourbontown Pharmacy open and operating at the same locations listed above.

24.  I know from the Kentucky BOP records and multiple witness interviews, BELL and BREWER are licensed pharmacists in Kentucky.  The investigation revealed BELL and BREWER have a business relationship based on witness interviews and bank records.[1] One witness interviewed stated BREWER also has ownership in Clark County Pharmacy in Winchester, KY. According to Kentucky SOS Winchester Pharmacy DBA Clark County Pharmacy is owned by Sarah Bell (BELL's wife). I know from Kentucky SOS, Kentucky BOP, and multiple witness interviews that BELL owned Georgetown Apothecary DBA Georgetown Pharmacy.

I.  **INVESTIGATION OF SIL-K, SILTREX PADS AND PRESCRIPTION VITAMINS**

25.  The Kentucky Office of the Attorney General's Office (KYAG) Medicaid Fraud Control Unit (MFCU) received a referral from Humana Special Investigation Unit (SIU) on BELL owned pharmacies, including Georgetown Apothecary DBA Georgetown Pharmacy, Bourbontown Pharmacy, Family Drug, and Nichols Apothecary, due to a

---

[1] Georgetown Pharmacy bank, Peoples Exchange Bank, account revealed regular payments to Drew Brewer from December 2019- March 2020 ranging from approximately $5,000 to approximately $8,800. A specific check dated December 12, 2019, was written to Drew Brewer for $33,589 with memo line "Bourbontown Startup." Another check was dated April 29, 2019, written to Drew Brewer for $5,797 with memo line "computers etc." Several other checks were written to Bourbontown Pharmacy in 2020 with the last one from the Peoples Exchange Bank account in October 2020.

spike in Kentucky Medicaid billing for Sil-K and Siltrex Pads,[2] which reimbursed at a high rate.

26.  Sil-K and Siltrex Pads are used to treat scars or burns on an individual. The pads are applied like a bandage on the skin. Sil-K and Siltrex Pads require a valid prescription from a licensed provider before they can be dispensed to a pharmacy customer.

27. The government's investigation revealed Georgetown Apothecary DBA Georgetown Pharmacy, Bourbontown Pharmacy, Family Drug, Nichols Apothecary and other BELL owned pharmacies repeatedly dispensed Sil-K, Siltrex Pads (which require a valid prescription before they can be dispensed) and prescription vitamins (i.e., vitamins requiring a valid prescription before they can be dispensed to a pharmacy customer) outside the scope of professional practice and not for a legitimate medical purpose.

28. On January 21, 2022, KYAG MFCU investigators received the case from Kentucky Office of Inspector General (OIG) Division of Audits and Investigations Medicaid Preliminary Investigations Branch [herein referred to as "KY OIG"]. The case resulted from a referral from Humana SIU, prompted by a spike in Kentucky Medicaid billing for Sil-K and Siltrex Pads. Humana SIU's investigation revealed Georgetown Pharmacy, Bourbontown Pharmacy, Family Drug, and Nichols Apothecary fraudulently

---

[2] According to Dailymed.nlm.nih.gov, Sil-K pads are "intended for non-invasive management of old and new hypertrophic or keloid scars resulting from burns, surgical procedures or trauma wounds." According to Dailymed.nlm.nih.gov, Siltrex pads are intended for use in the management, control, and prevention of old and new hypertrophic or keloid scars resulting from burns or surgical or traumatic injury of the skin. Sil- K Pads and Siltrex Pads reimbursed at a high rate by KY Medicaid. Medicaid reimbursed approximately $2,400-$4,900 for quantity of 4 Sil-K pads. Medicaid reimbursed approximately $14,800 for a quantity of 12 Siltrex pads.

dispensed Sil-K and Siltrex Pads to patients that were not authorized by the patient's primary care physician.

29. During Humana's SIU investigation, the investigator conducted patient outreach. The Humana Investigator found patients who were solicited by the pharmacies Georgetown Pharmacy and Bourbontown Pharmacy, indicating Sil-K and/or Siltrex Pads were free or covered by their insurance.  Humana SIU Investigator conducted prescriber outreach for Family Drug patients and found prescribers who could not provide records supporting the prescriptions for Sil-K and/or Siltrex Pads.

30. Humana's SIU investigation revealed Georgetown Pharmacy patients did not request services that had been billed by Georgetown Pharmacy. Further, prescribers denied authorizing claims billed by Georgetown Pharmacy. Several prescribers did not have provide medical records for the patients, or the medical records did not support the prescribing of Sil-K and/or Siltrex Pads.

31. Humana's SIU Investigation revealed Bourbontown Pharmacy and Family Drug prescribers for patients prescribed Sil-K and/or Siltrex Pads medical records did not support the prescriptions for Sil-K and/or Siltrex Pads. Further, some prescribers denied to Humana that they authorized the prescriptions.

32. Humana's SIU Investigation resulted in Humana terminating their contracts with four BELL owned pharmacies in April 2021, including Georgetown Pharmacy, Bourbontown Pharmacy, Family Drug, and Nichols Apothecary. The next month, according to BOP, BELL sold Bourbontown Pharmacy to BREWER.

## II.   INTERVIEWS: FORMER EMPLOYEE, PATIENTS, AND PROVIDERS

33. During the government's investigation multiple interviews were conducted to include KY Medicaid beneficiaries, prescribing physicians, and former employees of Georgetown Pharmacy.

34. On May 5, 2022, investigators interviewed J.R., a former Georgetown Pharmacy employee.  J.R. was a pharmacy technician for approximately eight years from 2013 through November 2020. J.R. started with Georgetown Pharmacy when it first opened and was owned by Mike Ingram.  BELL purchased Georgetown Pharmacy from Mike Ingram. J.R. stated everything changed when BELL and BREWER established a business relationship. Shortly after BELL and BREWER established a business relationship, J.R. heard BELL and Georgetown Pharmacy Pharmacist Kelli Preston [PRESTON] asking patients if they wanted to try "scar pads."

35. In J.R.'s experience as a pharmacy technician, soliciting patients was not normal practice for a pharmacy. J.R. did not recall any patients coming into Georgetown Pharmacy asking for scar or burn medications. In addition to J.R. hearing BELL and PRESTON solicit patients, J.R. heard BELL on the phone with patient's providers asking for prescriptions for the scar pads.  At time of interview, J.R. worked for another pharmacy and that pharmacy did not solicit customers for new prescriptions.

36. Investigators interviewed former Georgetown Pharmacy Tech employee S.A. S.A. stated BREWER would bring medications, S.A. referred to as "samples," to Georgetown Pharmacy.  S.A. observed BREWER head directly to BELL's office and meet with BELL for approximately 30 minutes and then BREWER would leave. S.A.

11

stated normally if another pharmacist came to Georgetown Pharmacy it was to help out with the pharmacy operations. S.A. thought it was strange BREWER did not help out and only met with BELL in his office when he came to Georgetown Pharmacy.

37.   Investigators interviewed multiple Medicaid beneficiaries who received Sil-K and/or Siltrex Pads, and vitamins from either Georgetown Pharmacy, Bourbontown Pharmacy and Family Drug.  On April 21, 2022, Investigators interviewed KY Medicaid beneficiary C.H., who was a customer of Georgetown Pharmacy. C.H. recalled one day in 2020 she picked up normal prescriptions from Georgetown Pharmacy and "Justin" told C.H. he put something for scars in C.H.'s bag. C.H. later found Sil-K pads in her bag. C.H. did not ask for any additional medications, she did not have any scars or burns, and C.H. did not use the pads. C.H. stated this happened approximately four times. C.H. only used the Sil-K pads on her grandchild's mosquito bite.

38. On another date in 2021, "Justin" put Dermacinrx Folitin-Z ["Folitin-Z"] multivitamins, a prescription vitamin, in C.H.'s bag, again unsolicited. C.H. received the Folitin-Z vitamins approximately three or four times.  C.H. did not discuss the Sil-K pads or prescription vitamins with her primary care provider ["PCP"] Dr. A.B., who was listed as the prescriber on both the Sil-K pads and Folitin-Z.  C.H. stated her PCP would always let C.H. know when he was calling in a prescription for C.H. C.H. used the vitamins, ran out of the Folitin-Z, and called Georgetown Pharmacy for a refill. C.H. was told by the pharmacy, the pharmacy were the ones offering the vitamin. Thus, C.H. believed the vitamins were initiated by the pharmacy and not her PCP.

39. After receiving the Sil-K pads and Folitin-Z, "Justin" came by C.H. residence and asked C.H. to sign a piece of paper stating C.H. received the medication. C.H. recalled "Justin" saying he needed C.H. signature so he could get paid. C.H. stated, it seemed like a "gimmick" to bill Medicaid insurance due to the high cost of Sil-K pads. C.H. still had a box of Sil-K pads and a bottle of Folitin-Z in C.H.'s residence.

40. KY Medicaid claims data for C.H. revealed her KY Medicaid was billed for Sil-K, Siltrex, Dermacinrx Folitin-Z and Dermacinrx Prenatrix, a prenatal vitamin. C.H. was not pregnant, had not been pregnant in years, and did not request a prenatal vitamin from her PCP or any other provider.

| Prescription | Number of Claims | Dates of Service | Billed Amount | Prescriber | Pharmacy |
|---|---|---|---|---|---|
| Sil-K | 3 Claims | 1/7/2020 2/8/2020 3/7/2020 | $4,945.55 $4,945.55 $4,945.55 | Dr. A.B. (C.H. Primary Care Provider) | Georgetown Pharmacy |
| Siltrex | 1 Claim | 3/27/2020 | $14,380.66 | Dr. A.B. | Georgetown Pharmacy |
| Dermacinrx Folitin-Z | 2 Claims | 7/5/2021 8/5/2021 | $1,392 $1,392 | Dr. A.B. | Georgetown Pharmacy |
| Dermacinrx Prenatrix | 1 Claim | 9/10/2021 | $2,105 | Dr. Gregory Schall[3] (Prescribe Wellness Protocol [4]) | Georgetown Pharmacy |

---

[3] Dr. Gregory Schall was the listed prescriber for 164 KY Medicaid beneficiaries prescribed Dermacinrx Prenatrix from 9/8/2021-9/10/2021, from Georgetown Pharmacy, Bourbontown Pharmacy, and Family Drug. Dr. Schall told investigators he had no agreement or protocol with Georgetown Pharmacy, Bourbontown Pharmacy or Family drug to prescribe nutritional supplements (vitamins) to include prenatal vitamins. Prescribe Wellness provided Investigators with two signed protocols from Dr. Gregory Schall. One for vaccines and an enhanced services protocol to included nutritional supplementation. Dr. Gregory Schall did not believe he signed two protocols with Prescribe Wellness. Dr. Gregory Schall only believed he had the vaccine protocol.

[4] KY BOP allows for approved protocols located on their website, https://pharmacy.ky.gov/Pages/Board-Approved-Protocols.aspx. The protocols allow for pharmacies to enter an agreement with a provider to provide certain services such as vaccines, strep/flu test, tobacco cessation programs, nutritional supplementation, etc. The pharmacy much follow the protocol exactly or the protocol is invalid, and the pharmacy would be operating out of normal professional practice.

41. On April 27, 2022, investigators interviewed KY Medicaid beneficiary J.L.C., a customer of Georgetown Pharmacy, whose PCP was Dr. A.B.  J.L.C. recalled receiving an unsolicited phone call from a man at Georgetown Pharmacy asking if she wanted to try scar pads. The man told J.L.C. her insurance covered the medication and asked if she had any scars. J.L.C. agreed to try the scar pads. She believed she received one or two boxes of scar pads from Georgetown Pharmacy.  J.L.C. did not speak with her PCP regarding the scar pads.

42. At the time of interview, J.L.C. still had a box of Sil-K pads at her residence. At some point J.L.C. stopped going to Georgetown Pharmacy due to the pharmacy no longer accepting her Humana KY Medicaid. J.L.C. recently started going back to Georgetown Pharmacy and stated the Pharmacy began taking her Humana KY Medicaid again.

43. KY Medicaid claims data for J.L.C. revealed her KY Medicaid was billed for Sil-K.

| Prescription | Number of Claims | DOS | Billed Amount | Prescriber | Pharmacy |
|---|---|---|---|---|---|
| Sil-K | 3 Claims | 1/8/2020<br>2/5/2020<br>3/25/2020 | $4,942.55<br>$4,942.55<br>$4,942.55 | Dr. A.B. | Georgetown Pharmacy |

44.  On August 4, 2022, investigators interviewed Dr. A.B., a physician at a medical clinic in Georgetown, KY. Dr. A.B. recalled receiving numerous electronic refill requests, for multiple patients, for Dermacinrx Folitin-Z from Georgetown Pharmacy. Dr. A.B. thought this was odd because he did not know what Dermacinrx Folitin-Z was and

14

did not believe he prescribed the prescription. Dr. A.B. stated, "I don't know what this is, I don't think they are on this. I don't even know what prescription that is, I don't think I wrote it." Dr. A.B. began to deny the Dermacinrx Folitin-Z prescription requests for his patients. After denying some of the refill requests, one of Dr. A.B. patients called him and told Dr. A.B. the prescription was a multivitamin. The patient said the pharmacy offered the vitamin and told the patient their insurance would cover the cost. The patient then asked for Dr. A.B. to fill the prescription. Dr. A.B. stated he only authorized the prescription when a patient specifically asked him for the vitamins. Dr. A.B. did not routinely prescribe multivitamins to his patients.

45.   Dr. A.B. did not recall any of his patients asking him for scar pads. Dr. A.B. did not routinely prescribe scar pads to his patients. After reviewing C.H. patient's record, Dr. A.B. believed Georgetown Pharmacy initiated the original prescription request for scar pads to Dr. A.B.'s office and obtained verbal consent from office staff, not Dr. A.B. Dr. A.B. did not speak with C.H. regarding scar pads, Dr. A.B. did not see a need for C.H. to be prescribed scar pads. Dr A.B. would not have authorized scar pads for C.H.

46. Below are the prescriptions dispensed by Georgetown Pharmacy to Dr. A.B.'s patients for medically unnecessary scar pads and high-cost vitamins[5]. Dr. A.B. stated he would not have authorized the prescriptions if he knew the pharmacy was soliciting his

---

[5] Dermacinrx products reimbursed at a high rate by KY Medicaid. Medicaid reimbursed approximately $1,300-$1,700 for 60 tablets of Dermacinrx Folitin- Z. Medicaid reimbursed approximately $1,300 for 30 tablets of Dermacinrx Prenatrix (prenatal vitamin).

patients, giving his patients unwanted prescription medications, that were not requested by the patient, and the pharmacy was misrepresenting the prescriptions to his office.

| Patient Name | Prescription | Insurance | Dates of Service |
|---|---|---|---|
| J.L.C | Sil-K- 3 Claims | KY Medicaid | 1/8/2020<br>2/5/2020<br>3/25/2020 |
| C.H. | Sil-K- 3 Claims<br>Siltrex- 1 Claims<br>Dermacinrx Folitin Z- 2 Claims<br>Dermacinrx Prenatrix -1 Claim | KY Medicaid | 1/7/2020<br>2/8/2020<br>3/7/2020<br>3/27/2020<br>7/5/2021<br>8/5/2021<br>9/10/2021 |
| J. B. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/5/2021 |
| L. C. C. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/8/2021 |
| B.C. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/5/2021 |
| M.C. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 8/4/2021 |
| K.C. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/20/2021 |
| P.C. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/5/2021 |
| M. F. | Sil-K – 4 Claims | KY Medicaid | 4/27/2018<br>5/9/2018<br>5/24/2018<br>6/6/2018 |
| C. G. | Sil-K- 3 Claims | KY Medicaid | 2/5/2020<br>2/29/2020<br>3/24/2020 |
| G. H. | Dermacinrx Folitin-z – 1 Claim | KY Medicaid | 7/8/2021 |
| R. R. | Dermacinrx Vitranol – 1 Claim | KY Medicaid | 2/10/2021 |

47. On June 16, 2022, investigators interviewed C.C., the team lead at medical clinic in Georgetown, KY. C.C. worked for Dr. T.D., a physician at the clinic. C.C. recalled Georgetown Pharmacy contacting the clinic requesting prescription vitamins for their

patient's. C.C. stated it was not normal for a pharmacy to contact a doctor's office to request a prescription vitamin.

48. C.C. was later contacted by Humana SIU regarding several of the clinic's patients receiving high-cost prescription scar pads and vitamins. C.C. advised the Humana SIU investigators the patients did not need high-cost vitamins or scar pads. Dr. T.R. confirmed with C.C. that patients could purchase over the counter vitamins, and he did not authorize scar pads. Dr. T.R. told investigators, "This was obviously, from our perspective, a scam."

49. C.C. spoke with "Justin" at Georgetown Pharmacy, after speaking with Humana SIU, regarding changes "Justin" wanted C.C. to make on several patient prescriptions. C.C. refused to make any changes. According to C.C., "Justin" became upset with C.C. for speaking with Humana SIU and not changing the prescriptions.

50. Below are the prescriptions dispensed by Georgetown Pharmacy, and one from Bourbontown Pharmacy to Dr. T.R. patients, for medically unnecessary prescription scar pads and high-cost prescription vitamins. Dr. T.R.'s office would not have authorized the prescriptions if they knew the pharmacy was soliciting their patients, the patients did not request the prescriptions, and/or received the prescription without the patient knowledge, and the pharmacy was misrepresenting the prescriptions to their office. None of the patients the investigators interviewed requested scar pads or vitamins from Georgetown Pharmacy or Bourbontown Pharmacy.

| Patient Name | Prescription | Insurance | Dates of Service |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **R.B.**<br>Solicited by Pharmacy, told they were free. R.B. told pharmacy she did not use the pads. Never discussed with PCP. | Sil-K- 3 claims<br><br>Siltrex- 1 claim | KY Medicaid | Georgetown Pharmacy<br><br>1/14/2020<br>2/17/2020<br>3/24/2020<br>3/31/2020 |
| **P.B.**<br>Received multi-vitamins. Was asked if she wanted to try them for free from pharmacy. Received for 1 year. PCP told her she didn't need them.<br><br>P.B.'s patient chart revealed on 4/14/2019 Justin called PCP stating P.B. asked for a vitamin and P.B. found one covered 100% by her insurance.<br><br>P.B.'s patient chart revealed on 7/31/2019 P.B. was told by T.R. office she could get over the counter (OTC) vitamins. P.B. told T.R. office she did not ask for the vitamins. | Nicazyne (multivitamin)- 4 claims<br><br><br>Folika-V (multivitamin)- 1 claim | Commercial Humana | Georgetown Pharmacy<br><br>4/16/2019<br>8/21/2019<br>9/17/2019<br>12/13/2019<br>12/31/2019 |
| **J.L.F.**<br>Received pads in bag one day with regular medications. Told by male at pharmacy they were covered by her insurance. J.L.F. did not request pads. Never spoke to PCP regarding pads. Also received a lot of "pain patches" J.L.F. did not request. | Sil-K- 2 claims by Dr. John Adkins (An OBGYN)<br><br>Sil-K – 3 claims by T.R. | KY Medicaid | Georgetown Pharmacy<br><br>5/21/2018<br>6/22/2018<br><br><br>1/9/2020<br>2/5/2020<br>3/2/2020 |
| **S.C.**<br>Not interviewed | Sil-K- 3 claims | KY Medicaid | 5/4/2018<br>5/21/2018<br>7/30/2018 |
| **J.C.**<br>Wife of R.C. Had KY Medicaid for short time in 2018. When on Medicaid "Justin" offered J.C. scar pads to give to her husband, R.C., due to recent surgery. J.C. never asked for pads and did not want the pads. Justin said J.C. did not need a prescription and gave | Sil-K- 4 claims | KY Medicaid | Georgetown Pharmacy<br><br>4/25/2018<br>5/9/2018<br>5/21/2018<br>6/6/2018 |

| | | | |
|---|---|---|---|
| her several boxes. The pads were prescribed to her and R.C. Never used, never opened, and still had prescriptions under their sink. J.C. did not have scars and did not realize she was prescribed the pads. | | | |
| **R.C.** Husband of J.C. Received Sil-K pads. Never asked for pads and never used pads. | Sil-K- 4 claims | KY Medicaid | Georgetown Pharmacy 4/25/2018 5/9/2018 5/21/2018 6/6/2018 |
| **J.F.** Did not remember receiving vitamins or the pharmacy asking him about vitamins. Only remembered receiving regular medications from Bourbontown Pharmacy. Did not need vitamins. | Dermacinrx-Folitin-Z 2 claims | KY Medicaid | Bourbontown Pharmacy 7/2/2021 7/26/2021 |
| **V.S.** Not interviewed | Sil-K- 1 claim | KY Medicaid | Georgetown Pharmacy 5/23/2018 |

51. On May 4, 2022, investigators interviewed KY Medicaid beneficiary M.A., who was a customer of Bourbontown Pharmacy for two years.  M.A. recalled picking up her normal medication from Bourbontown Pharmacy and a bottle of vitamins was in her bag with her regular medication. M.A. did not recall the pharmacy offering the vitamins or asking M.A. if she wanted vitamins. M.A. asked Dr. P.S., the prescriber listed on the vitamins, if Dr. P. S.  prescribed them for M.A. Dr. P.S. told M.A. she did not prescribe the vitamins. M.A. stated the vitamins were gross and did not take them.

52. Investigators asked M.A. if she received a bottle of prenatal vitamins in September 2021. M.A. did not recall receiving prenatal vitamins from Bourbontown Pharmacy or any pharmacy. M.A. had a tubal ligation approximately 10 years prior and

was not pregnant. M.A. did not know Dr. Gregory Schall, the prescriber on the KY

Medicaid claims data for the prenatal vitamins. M.A. did not request prenatal vitamins

from any pharmacy or provider.

53. M.A. KY Medicaid claims data revealed her KY Medicaid was billed for

Dermacinrx Folitin-Z and Dermacinrx Prenatrix.

| Prescription | Number of Claims | Dates of Service | Billed Amount | Prescriber | Pharmacy |
|---|---|---|---|---|---|
| Dermacinrx Folitin-Z | 2 Claims | 7/7/2021 8/2/2021 | $1,392 $1,392 | Dr. P.S. | Bourbontown Pharmacy |
| Dermacinrx Prenatrix | 1 Claim | 9/9/2021 | $2,115 | Dr. Gregory Schall | Bourbontown Pharmacy |

54. On August 10, 2022, investigators interviewed Dr. P.S., a licensed physician at

a medical clinic in Paris, KY. Dr. P.S. was aware investigators were speaking with her

regarding Bourbontown Pharmacy giving her patients vitamins she did not approve. Dr.

P.S. provides Medication Assisted Treatment (MAT) for her opioid addicted patients with

Suboxone. Dr. P.S. noticed, only her Suboxone patients were receiving vitamins she did

not approve, from Bourbontown Pharmacy. Dr. P.S. called Bourbontown Pharmacy and

spoke with "Drew." Drew told Dr. P.S. the pharmacy had a free program for patients with

addictions, providing them vitamins at no cost. Dr. P.S. did not know Bourbontown was

billing KY Medicaid for the vitamins. Several of Dr. P.S. patients stated they liked the

vitamins, therefore, Dr. P.S. refilled them believing the vitamins were part of a free

program.

55. Bourbontown Pharmacy never notified Dr. P.S. that Bourbontown would dispense prescription vitamins to her patients. Dr. P.S. stated her patients told her they found the vitamin bottles in their bags with their regular prescriptions, with no explanation from Bourbontown Pharmacy. Many patients were confused because they did not know what the bottle was for. Several of Dr. P.S. patients had another provider listed as the prescriber on the bottle. Those patients were concerned because they did not know the doctor listed on the bottle.

56. Dr. P.S. learned of Bourbontown Pharmacy dispensing prescription allergy eye drops to her patients. The prescribing provider was a doctor located in Western Kentucky. Dr. P.S. believed Bourbontown Pharmacy was trying to use a KY BOP approved protocol[6] to prescribe her patients vitamins and allergy eye drops. Dr. P.S. said Bourbontown was not following the protocol due to Bourbontown not notifying her when dispensing prescription products to her patients and Bourbontown was not educating the patients when the prescription was dispensed.

57. Dr. P.S. was contacted by an entity in California regarding several of her patients receiving high-cost vitamins. At that point Dr. P.S. became aware of the cost of the vitamins and that Bourbontown was billing KY Medicaid for these vitamins, they were not free. Dr. P.S. was appalled at the price of the vitamins and never would have approved the

---

[6] KY BOP allows for certain protocols between a pharmacy and a provider. For example, the pharmacy can have protocol for vaccines, routine testing's, opioid use disorder, nutritional supplementation and more. The pharmacy can initiate the dispensing of certain medications, treatments or vaccines but must follow the KY BOP approved protocol.  The pharmacy may not alter, change or deviate from the protocol. KY BOP states if a pharmacy does not follow the protocol, then the pharmacy does not have a protocol. List of protocols found at https://pharmacy.ky.gov/Pages/Board-Approved-Protocols.aspx.

vitamins if she knew Bourbontown was billing KY Medicaid. Dr. P.S. would have advised her patients to purchase over the counter vitamins. Dr. P.S. stated, "You can't empirically just give vitamin to a certain population," referring to only her MAT patients receiving the vitamins.

58. Below are the prescriptions dispensed by Bourbontown Pharmacy to Dr. P.S. MAT patients for medically unnecessary high-cost multivitamins. Dr. P.S. stated she would not have authorized the prescriptions if she knew the pharmacy was soliciting her patients, putting the vitamins in her patients bags without their knowledge, the vitamins were not requested by the patient, the vitamins were not free, and the pharmacy was billing KY Medicaid for them.

| Patient Name | Prescription | Insurance | Dates of Service |
|---|---|---|---|
| M. A. (same patient referenced in ¶ 51) | Dermacinrx Folitin-Z- 2 Prescriptions | KY Medicaid | 7/7/2021 and 8/2/2021 |
| A. B. | Dermacinrx Folitin-Z 1 Prescriptions | KY Medicaid | 7/2/2021 |
| A. F. | Dermacinrx-Folitin-Z 2 Prescriptions | KY Medicaid | 7/5/2021 and 8/2/2021 |
| C. H. | Dermacinrx Folitin-Z 2 Prescriptions | KY Medicaid | 7/9/2021 and 8/5/2021 |
| R. H. | Dermacinrx Folitin-Z 1 Prescription | KY Medicaid | 7/5/2021 |
| T. M. | Dermacinrx-Folitin-Z 2 Prescriptions | KY Medicaid | 7/7/2021 and 8/2/2021 |
| J. M. | Dermacinrx-Folitin-Z 1 Prescription | KY Medicaid | 1/26/2021 |
| K. M. | Dermacinrx Folitin-Z 1 Prescription | KY Medicaid | 7/26/2021 |
| A. P. | Dermacinrx Folitin-Z 2 Prescriptions | KY Medicaid | 7/5/2021 and 8/2/2021 |
| J. S. | Dermacinrx Folitin-Z 2 Prescriptions | KY Medicaid | 7/2/2021 and 7/26/2021 |
| D. T. | Dermacinrx Folitin-Z 2 Prescriptions | KY Medicaid | 7/6/2021 and 8/9/2021 |
| M. T. | Dermacinrx Folitin-Z 1 Prescription | KY Medicaid | 7/25/2021 |

| K. T. | Dermacinrx Folitin-Z 1 Prescription | KY Medicaid | 7/26/2021 |
| R. T. | Dermacinrx Folitin-Z 2 Prescriptions | KY Medicaid | 2/3/2021 and 7/27/2021 |

59. The investigation revealed numerous customers of Georgetown Pharmacy, Bourbontown Pharmacy and Family Drug who were solicited for or received without their knowledge or consent, medically unnecessary prescription scar pads, high-cost prescription multivitamins, and prenatal vitamins. The customers did not request the scar pads or vitamins from the pharmacies or their PCPs. On several occasions the customers did not recall receiving the amount of scar pads or vitamins their KY Medicaid was billed for and several customers were not aware they received extra medication until they left the pharmacy.

| Patient Name | Prescriptions | Insurance | Pharmacy | Dates of Service |
| --- | --- | --- | --- | --- |
| **T.C.** Did not ask for scar pads. "Justin" told her they were free. Justin said they cost him $300/box. She never spoke with her PCP about the pads. Never used the pads.  Also offered vitamins she did not request. She never spoke with her PCP about vitamins. Received a bottle of prenatal vitamins in her bag. She called up to Georgetown thinking it was a mistake. She was told it was free from her insurance. She was never pregnant and had a hysterectomy in 2014. | Sil-K- 3 Claims  Dermacinrx Folitin-Z- 1 claim  Dermacinrx Prenatrix- 1 claim | KY Medicaid | Georgetown | 1/15/2020, 2/17/2020, 3/24/2020  7/21/2021 (Folitin Z)  9/10/2021 (Prenatrix) |

| | | | | |
|---|---|---|---|---|
| **A.B.**<br>"Justin" asked her to try scar pads at Georgetown Pharmacy. Scar pads did not work. She never spoke to her PCP regarding the scar pads. Also received vitamins. She never asked for vitamins. She received prenatal vitamins in her bag one day. Did not realized it till she left the pharmacy. She had a hysterectomy in 2005 and did not need or want prenatal vitamins. | Sil-K- 3 claims<br><br>Dermacinrx Folitin Z- 2 claims<br><br>Dermacinrx Prenatrix- 1 claim<br><br>Azesco- 3 claims (vitamin)<br><br>Folika T- 1 claim (vitamin) | KY Medicaid | Georgetown | 5/2/2018, 5/6/2018, 5/25/2018<br><br>7/12/2021, 8/20/2021-Folitin Z<br><br>9/10/2021-Prenatrix<br><br>7/18/2019, 8/22/2019, 9/19/2019-Azesco<br><br>10/11/2018 |
| **C.T.**<br>Never asked for scar pads. pharmacy asked her if she wanted to try them for free. Never spoke with her PCP regarding the scar pads. She did not remember receiving any vitamins from the pharmacy. She did not ask for vitamins and did not discuss with her PCP. She buys over the counter vitamins. She had a hysterectomy in 2009 and was not pregnant. | Sil-K- 2 claims<br><br>Dermacinrx Folitin Z- 2 claims<br><br>Dermacinrx Prenatrix- 1 claim | KY Medicaid | Georgetown | 5/25/2018, 6/22/2018<br><br>8/2/2021, 8/30/2021- Folitin Z<br><br>9/10/2021-Prenatrix |
| **H.P.**<br>Never asked for vitamins. Received from the pharmacy with regular medications. Called Bourbontown and "Drew" told him his insurance covered the vitamins. | Dermacinrx Folitin Z- 2 claims<br><br>Folite- 1 claim<br><br>Dermacinrx Vitranol – 1 claim | KY Medicaid | Bourbontown | 7/1/2021, 7/26/2021 Folitin Z<br><br>1/13/2021 Folite<br><br>2/10/2021 Vitranol (vitamin) |
| **K.K.**<br>Justin Bell offered her pads. She did not need them, told Bell to stop giving her the pads. Bell came to her home asking her to sign paperwork regarding the pads. | Sil-K- 9 claims from 4/2018-1/2020<br><br>Siltrex- 1 claim | KY Medicaid | Georgetown | 5/5/18, 5/15/18, 5/31/18, 6/22/18, 11/23/18 (twice on that day), 1/26/2020, 2/8/2020, 3/7/2020, 4/9/2020 |

| | | | | 4/1/2020- Siltrex |
|---|---|---|---|---|
| **J.L.C.**<br>Offered via unsolicited phone call from Justin Bell. Never discussed prescription with her PCP. | Sil-K- 3 claims | KY Medicaid | Georgetown | 1/8/2020, 2/5/2020, and 3/25/2020 |
| **C.C.**<br>Offered scar pads by pharmacy. | Sil-K- 3 claims<br><br>Siltrex – 2 claims | KY Medicaid | Georgetown | 1/9/2020, 2/5/2020, 3/3/2020<br><br>3/30/2020, 3/31/2020- Siltrex |
| **I.B.**<br>Did not remember if she received scar pads. Did get multivitamins. | Sil-K 3 claims<br><br>Siltrex- 1 claim<br><br>Dermacinrx Folitin-Z- 1 claim | KY Medicaid | Family Drug | 1/16/2020, 2/11/2020, 3/7/2020<br><br>4/1/2020- Siltrex<br><br>8/4/2021- Folitin |
| **D.H.**<br>Did not remember any prescriptions being offered. Did not ask for any vitamins or scar pads. Did not recall receiving any vitamins or scar pads from Bourbontown Pharmacy. D.H. did not recognize the box of Sil-K or Siltrex pads. Did not talk with PCP about scar pads or vitamins. Was not pregnant at time of prenatal prescription. | Sil-K- 1 claim<br><br>Siltrex- 1 claim<br><br>Dermacinrx Folitin-Z- 2 claims<br><br>Dermacinrx Prenatrix- 1 claim | KY Medicaid | Bourbontown | 2/29/2020<br><br>3/27/2020- Siltrex<br><br>7/6/2021, 8/2/2021- Folitin<br><br>99/2021- Prenatrix |
| **M.V.**<br>Offered pads from pharmacy. Stated the pads were free. Also given two separate creams (Dermacinrx products) unsolicited. Creams contained ingredient M.V. could not use. | Sil-K- 1 claim<br><br>Siltrex- 1 claim | KY Medicaid | Bourbontown | 1/9/2020<br><br>3/31/2020- Siltrex |

| | | | | |
|---|---|---|---|---|

60.  Recent patient interviews have indicated Bourbontown and Georgetown pharmacies are continuing the above-described conduct with other non-controlled prescription medications, including topical pain creams/sprays and prescription allergy medications.  Patients have reported receiving pain creams/sprays and allergy medication unprompted, in the same bags as their legitimate prescriptions, without any pharmacy staff notifying them or their PCP prescribing them.

## III.   HEALTH CARE FRAUD INVESTIGATION

61. Georgetown Pharmacy, Bourbontown Pharmacy, and Family Drug consistently practiced outside the scope of acceptable practice per Kentucky 907 KAR 1:672[7] and violated their agreement with Kentucky Medicaid per their signed Kentucky Medicaid enrollment documentation, by BELL and BREWER, regarding 42 USC Section 1320a-7b Criminal Penalties for Acts Involving Federal Health Care Programs.[8]

62. According to Medicaid Claims data, Georgetown Pharmacy billed KY Medicaid approximately $705,000 for Sil-K pads, $118,00 for Siltrex pads, $195,000 for

---

[7] 907 KAR 1:627 Provider enrollment, disclosure, and documentation for Medicaid participation section 5 states Unacceptable Practice. The activities listed in this section shall constitute unacceptable practice: (1) Knowingly submitting, or causing the submission of false claims, or inducing, or seeking to induce, a person to submit false claims; (2) Knowingly making, or causing to be made, or inducing, or seeking to induce a false, fictitious or fraudulent statement or misrepresentation of material fact in claiming a Medicaid payment, or for use in determining the right to payment; (3) Having knowledge of an event that affects the right of a provider to receive payment and concealing or failing to disclose the event or other material omission with the intention that a payment be made or the payment is made in a greater amount than otherwise owned; (4) Conversion; (5) Soliciting or accepting bribes or kickbacks.

[8] 42 USC § 1320a-7b sets forth the criminal penalties for acts involving Federal health care programs, including: (a) making or causing to be made any false statements or representations; and (b) knowingly and willfully soliciting or receiving illegal remunerations (including kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind.

Dermacinrx Prenatrix, $490,000 for Dermacinrx Folitin-Z, and $300,000 for the various other high-cost vitamins between 1/1/2017 and 2/28/2022 and was paid a total of $1,516,811 for those claims.

63.  According to Medicaid Claims data, Bourbontown Pharmacy billed KY Medicaid approximately $64,000 for Sil-K pads, $74,000 for Siltrex pads, $70,000 for Dermacinrx Prenatrix, $309,000 for Dermacinrx Folitin-Z, and $302,000 for various other high-cost vitamins between 1/1/2017 and 2/28/2022 and was paid a total of $705,164 for those claims.

64.  According to KY Medicaid Claims data, Family Drug billed KY Medicaid approximately $24,000 for Sil-K pads, $15,000 for Siltrex pads, $370,000 for Dermacinrx Prenatrix, $327,000 for Dermacinrx Folitin-Z, $800,500 for various other high-cost vitamins between 1/1/2017 and 2/28/2022 and was paid a total of $1,026,465 for those claims.

65.  During the investigation, Express Scripts SIU notified investigators of inappropriate prescribing and dispensing of high-cost vitamins from Bourbontown Pharmacy and Winchester Pharmacy DBA Clark County Pharmacy.  Clark County Pharmacy is owned by Sarah Bell, Justin Bell's wife.  Express Scripts' investigation revealed that Bourbontown Pharmacy and Clark County Pharmacy were adding high-cost prescription vitamins to Express Scripts members orders without consulting the member. According to the Express Scripts' investigation, one member questioned the pharmacy about the vitamins. The pharmacist told the member that the pharmacy uses a protocol doctor, who determined they would benefit from taking the vitamins. The pharmacist

further stated not to worry about the vitamins because his insurance covered it and there

was no copay charge.  The member advised Express Scripts SIU they did not know the

doctor listed on the prescription bottle. The Express Scripts investigation is ongoing.

66.  Based on my training, experience, and consultation with other law

enforcement officers, I also know that most modern pharmacies use a dispensing system.

Pharmacy dispensing/management systems serve modern pharmacies in several core

functions, including ordering entry functions for the pharmacy, record dispensing

information, maintenance of inventory records, and assistance in purchasing. In this case,

based on interviews of former employees, I believe Georgetown Pharmacy and

Bourbontown Pharmacy use a pharmacy dispensing system named RX30. The following

data is typically entered into the dispensing system: the name of the patient for which the

prescription was written, the date the prescription was written, the date the prescription

was dispensed by the pharmacy, the name of the provider who issued the prescription for

the patient, the drug for which the prescription was issued, the prescription concentration

(such as the mg) for which the prescription was issued, the number of pills or volume of

the prescription, the number of refills for which the prescription was issued (along with

the tracking information designation for the pharmacist who filled the prescription), and

the national drug code (NDC) of the drug to be dispensed. Once this information is

recorded for each prescription, the RX30 pharmacy dispensing system then assigns a

prescription number unique to each prescription.

67. Often these pharmacy dispensing systems have an optional point of sale

system which works in conjunction with the dispensing system to track the sale of the

drugs, assist in the billing of insurance companies (often electronically via the Internet or Intranet dedicated systems), and process cash sales. The pharmacy dispensing/management system records the drugs that are dispensed, submits a bill electronically to the insurance company or companies, and generates multiple hardcopy printouts of a label for the prescription bottle indicating the specific information noted above. Multiple copies are produced so that both the patient and pharmacy can maintain a tangible record of the distributed prescription.

68.  I know, based on my training and experience, and after consultation with other law enforcement officers, that when a provider issues a prescription, the prescribing physician or other provider indicates the number of refills (if any) that are permitted relative to each prescription issued. The number of refills allowed for each prescription is indicated on the prescription, either in hard copy or electronically by the prescribing medical provider. Typically, the number of refills is entered into the pharmacy's computer dispensing system. If the patient requests a refill of his or her prescription, the pharmacy will denote and track the additional drugs dispensed relative to the parameters of the original prescription. The appropriate insurance company is then billed for each subsequent refill relative to the original prescription (typically cash payment for refills are also noted in the pharmacy's computer dispensing system).

69.  Based on my training and experience, I believe a full accounting of Georgetown Pharmacy and Bourbontown Pharmacy's dispensing and billing data is relevant to this investigation. Investigators hope to determine whether there is a difference between the amounts of drugs obtained by the pharmacy from its supplier(s)

and compare it to the amount the pharmacy dispensed and/or billed according to its records. For instance, if Georgetown Pharmacy obtained 100 units of a particular drug, but its dispensing and billing data indicates that the pharmacy billed for 300 units, this is strong evidence of the suspected fraudulent billing scheme, often referred to as "billing but not filling" (i.e., billing insurance providers for drugs but never dispensing said drugs to customers). The proposed inventory will aide in this analysis by factoring in any drugs that remain in inventory (e.g., if the pharmacy obtained 100 units of a drug from its supplier, billed for 300, but still has 50 in inventory, this indicates the billing was even further inflated). In order to conduct this analysis, investigators need to account for all drugs that were dispensed and billed on some other date.

70.  Based upon the continued investigation, I believe BELL, BREWER, Georgetown Pharmacy, and Bourbontown Pharmacy have engaged in fraudulent billing practices regarding the dispensing of drugs. In my experience fraudulent conduct of this type which goes unchecked or uninvestigated will continue. An accurate audit requires review of three components: wholesaler records, internal dispensing records, and an inventory count. In my experience, a pharmacy's inventory will not be dispensed immediately and will remain on the shelves for several months. It is also my experience that pharmacies often mix into a single bottle drug purchased at different times. It is essential for an accurate audit that the current drug inventory be seized for the limited purpose of a quantity count.

71. Based on continued investigation, I believe Georgetown Pharmacy and Bourbontown Pharmacy are using the KY BOP approved protocols to fraudulently

dispense high-cost vitamins to KY Medicaid and private insurance beneficiaries. KY BOP protocols are intended to be used by a pharmacy and a provider working together for patient needs. According to the KY BOP, the BOP approved protocols are to be explicitly followed by the pharmacy, and any deviation from the protocol renders it invalid. Therefore, any prescriptions dispensed by the pharmacy are dispensed outside of professional and acceptable practice.

72. Based on my experience, training and background, my participation in health care fraud and other investigations, and my conversations with other experienced law enforcement agents, I know that:

a. Persons involved in the health care industry maintain a large amount of information on computers. These health care industries utilize an electronic medical records system that provides detailed information such as what services the patients received, treating physician, billing, payment, location of treatment etc.

b. The majority of Medicare, Medicaid, and general insurance claims are submitted electronically via computer.

c. Medicare, Medicaid, and private insurance companies maintain large web based sites which provide education material and claim submission assistance to medical providers.

d. Many companies conduct business transactions such as banking, product ordering, travel, etc, via computers.

e.   Electronic medical records, diagnostic readings, and prescriptions are becoming increasingly popular with health care professionals.

f.   Persons involved in criminal activities often conceal information in their computers.

g.   Persons involved in criminal activities amass proceeds from the criminal activities to otherwise conceal them from discovery by law enforcement officers. To accomplish these goals, individuals engaged in criminal activities often use the services of banks and financial institutions, including but not limited to, bank accounts and their attendant check writing privileges and the purchase of securities, cashier's checks, money drafts, and letters of credit. These individuals often purchase real estate or deposit proceeds in the bank accounts in another individuals' or entity's name, to conceal the true ownership and illegal source of the proceeds. Records and documents related to these transactions are often maintained where these individuals have easy and ready access to them, including in their residences and businesses, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

h.   Persons involved in criminal activities, commonly maintain in their business's notes, phone numbers, memorandums, books, papers, patient files and business documents relating to the criminal activity and/or associates involved in the illegal activity, which are often kept as computer data files in computers or data in cell phones and personal digital assistants.

i.  Unexplained wealth is probative of crimes motivated by greed, including the criminal activity. Person involved in criminal activity usually maintain documents related to wealth in their businesses, which are and often kept as computer data files in computers or data in cell phones and personal digital assistants.

73.  Based on my training and experience, there is probable cause to believe that evidence of the fraudulent conduct described above will be found at Georgetown Pharmacy and Bourbontown Pharmacy.  As noted, the dispensing record is typically also maintained as part of the pharmacy management system. The laws and regulations of Kentucky, including 201 KAR 2:170, require such records to be maintained for five years after the date the drug is dispensed and controlled substance inventory records including invoices must be kept for five years pursuant to KRS 218A.200.

## PROPOSED MANNER AND MEANS OF SEARCH

74.  From my experience and training in investigation white collar fraud, I know that individuals engaged in crimes such as these often maintain records pertaining to their crimes as well as instrumentalities and fruits of their crimes at their businesses and residence. Often this information is stored on computer systems as well as "hard" physical copies. I know from my training and experience that computer hardware, software, PDS's, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:

a.    The objects themselves may be instrumentalities, fruits or evidence of a crime; and/or

b.   The objects themselves may have been used to collect and store information about the crimes (in the form of electronic data).

75.   Based on my training, experience, and information related to me by investigators and other involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including external hard drives, thumb drives, CDs, DVDs, hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched

b.   Search computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden", erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction,

34

a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.   Typically, the volume of the data stored on many computer systems and storage devices will be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

d.   Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files. However, a user can easily change that extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryptions, which means that a password or device, such as a "dongle" or "keycard", is necessary to decrypt the data into readable form.

76.   Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords and data security devices which are (1) instrumentalities, fruits of evidence of a crime, or (2) storage devices for information about the crime(s). I also know from my training and experience as an agent that computer storage devices can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he/she will often store it in random order with deceptive file names. This requires

searching authorities to examine all the stored data to determine whether it is included in the warrant.

77.   Furthermore, I know from my training and experience as an agent that searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The wide variety of computer hardware and software available requires even computer experts to specialize in some systems and applications. Consequently, it is difficult to know before a search which expert should analyze the system and its data.

78.   In light of this information and these concerns, I hereby request the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to make mirror images and/or copies of the computer hard drives and to conduct an off-site search of the hardware for the evidence described.

79.  Further, in order to establish a complete drug inventory assessment, agents hope to conduct (as a part of this requested search warrant), under the supervision of Kentucky state licensed pharmacists and operating within the scope of the search warrant, a pill count (inventory) of specific prescription-only drugs in order to assist in proving healthcare fraud violations that may have occurred at Georgetown Pharmacy and Bourbontown Pharmacy. A pharmacy's purchase records, onsite inventory, and dispensing records are in essence a closed system. Pharmacies can only order prescription-only drugs from licensed wholesalers or licensed entities authorized by state and federal laws to sell prescription-only drugs. As part of the sale of these prescription-

only drugs, valid orders and subsequent invoices are issued relative to these sales. A record of these prescription-only drug sales is required by state law 201 KAR 2:170 to be maintained for 5 years after the date the drug was dispensed. These dispensing records are typically also maintained as part of the pharmacy management system. Using the records of the purchase of the prescription-only drugs, the dispensing records of those drugs, and the remaining prescription-only drugs held at each pharmacy, will permit a full accounting of the pharmacy's activities. The amount of the prescription-only drugs purchased by a pharmacy should equal the amount of the drugs held in stock at the pharmacy plus the amount of the drugs sold by the pharmacy.

## **CONCLUSION**

80.   Based on the facts set forward in this affidavit, there is probable cause to search the premises located at 1002 South Broadway Street, Suite #7, Georgetown, KY 40324 and 1822 Main Street, Paris, KY 40361 as described in Attachment A for evidence of crimes by BELL, BREWER, and others associated with Georgetown Pharmacy and Bourbontown Pharmacy as described in Attachment B, which constitutes the commission of criminal offenses in violation of Healthcare Fraud (18 U.S.C. § 1347), Conspiracy to Commit Healthcare Fraud (18 U.S.C. § 1349), False statements and Claims in Health Care Matters (18 U.S.C. § 1035), and Wire Fraud (18 U.S.C § 1343).

## **REQUEST FOR SEALING**

81.  I further request the Court order that the documents in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public

nor known to all of the targets of this investigation. Accordingly, there is good cause to seal these documents because other premature disclose may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

/s/ Jaime Terry

Jaime Terry, Special Agent
Federal Bureau of Investigation

Transmitted by email and attested to by telephone in accordance with Fed. R. Crim. P. 4.1 on this 21st day of _____ October _____, 2022.

THE HONORABLE MATTHEW A. STINNETT
UNITED STATES MAGISTRATE JUDGE